

'08 CIV 4076

Counsel of Record:
Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0068 (William Finkel)
(212) 336-1320 (fax)

RECEIVED
MAY 0 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,          :          08 CV ___ (__)

              v.                                  :

SALVATORE LAGRECA and BRIAN WATSON,               :

                                                  :          **COMPLAINT**

                              Defendants.         :

———————————————————————

       Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against defendants Salvatore LaGreca ("LaGreca") and Brian Watson ("Watson")

(collectively, the "Defendants"):

## SUMMARY

       1.      This case arises out of Interpublic Group of Companies, Inc.'s ("IPG") failure to

reconcile its intercompany accounts and expense its intercompany charges.   In the Fall of 2002,

IPG restated its financial results in an amount of $181 million for the period 1997 to 2002.   The

largest component of this restatement (approximately $101 million) was attributable largely to

the fact that McCann Erickson Worldwide, Inc. ("McCann"), IPG's largest subsidiary, recorded

as receivables intercompany charges that should have been expensed.

2.     McCann officers and employees, including LaGreca, McCann's Vice-Chairman, Finance and Operations and Chief Financial Officer ("CFO"), and Watson, the Chief Operating Officer of the Europe-Middle East-Africa region ("EMEA"), failed to ensure McCann reconciled its intercompany accounts for at least six years.  At times, LaGreca and Watson purposely delayed reconciling intercompany accounts because they knew a reconciliation would result in write-offs that would interfere with McCann's efforts to hit internal annual profit targets. Because McCann never fully reconciled its intercompany accounts and failed to expense properly intercompany charges, McCann's financial results were inaccurate.  While LaGreca and Watson did not know the extent of the intercompany exposures that existed, or that the resulting write-offs would be material to IPG's financial statements, they ignored the red flags that IPG's financial results were misstated.  By 2002, McCann's intercompany accounts were misstated by approximately $101 million.  As LaGreca and Watson knew, IPG then incorporated McCann's financial results in IPG's consolidated financial statements.

3.     Through this conduct, LaGreca and Watson aided and abetted McCann's violations of Sections 10(b), 13(a) and 13(b)(2)(A) and (B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b), 78m(a) and 78m(b)(2)(A) and (B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§240.10b-5, 12b-20, 13a-1, 13a-11 and 13a-13].

## JURISDICTION AND VENUE

4.     The Commission brings this action pursuant to authority conferred by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1).  The Commission is seeking permanent

2

injunctive relief, disgorgement and prejudgment interest thereon from LaGreca and Watson. The Commission also seeks civil penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), against LaGreca and Watson. Finally, the Commission seeks all other just and appropriate relief.

5.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.    Venue lies in this court pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices and courses of business occurred within the Southern District of New York. For example, IPG's and McCann's headquarters are located in New York, New York.

7.    LaGreca and Watson, directly and indirectly, singly and in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

### THE DEFENDANTS

8.    **Salvatore LaGreca,** 55, a resident of Port Washington, New York, served as McCann's Vice-Chairman, Finance and Operations and CFO from January 1996 to October 2002. LaGreca is a CPA licensed in the State of New York. LaGreca, among other things, oversaw McCann's accounting, financial reporting, strategic planning, mergers and acquisitions, and budgeting.

9.    **Brian Watson**, age 60, a resident of the United Kingdom, joined EMEA as Director of Operations in 1996, from 2000 served as Chief Operating Officer and in

3

approximately May 2002 became Deputy Regional Director of EMEA. Watson has no formal training in accounting and has never been a certified public accountant. Although Watson was not an accountant, from approximately the middle of 1998 until January 2000, and from early 2001 to May 2002, when EMEA did not have a Finance Director, Watson handled many aspects of the Finance Director's responsibilities.

## OTHER RELEVANT PARTIES

10.    **IPG** is an advertising and media holding company that owns over 600 advertising agencies and other companies in approximately 130 countries. IPG is headquartered in New York, New York, and its stock is listed on the New York Stock Exchange.

11.    **McCann** is a Delaware corporation that IPG wholly owns. McCann maintains its headquarters in New York. McCann's revenues during the relevant period constituted approximately one-third to over one-half of IPG's revenues. McCann is organized into regional subsidiaries: North America, EMEA, Asia Pacific and Latin America. In terms of number of operating agencies, EMEA was McCann's largest region with 193 operating agencies in 40 countries. McCann grew dramatically between 1996 and 2001, including acquiring over 100 companies. During this period, McCann's revenues increased from approximately $1.1 billion to $2.1 billion. McCann Advertising, Ltd. ("MEA"), McCann's advertising agency in London, was one of EMEA's largest agencies.

12.    **PriceWaterhouseCoopers, LLP** ("PwC US") served as the global auditing firm to IPG throughout the relevant period. PricewaterhouseCoopers' UK affiliate ("PwC UK") served as the external auditor for EMEA's headquarters and MEA.

4

## FACTS

### Background

**IPG's Corporate Culture**

13.    IPG and McCann had a deep-rooted culture that emphasized profits as the company's prime objective.

14.    MEA's Finance Director from 1997 through early 2000 described the drive to deliver profits as very aggressive.

15.    Every year from 1997 through 2001, PWC UK listed "pressure from parent company to produce results in line with budget" as a risk factor at MEA, McCann's advertising agency in London, in PWC's internal audit strategy memorandum.

16.    Every fall, McCann conducted "Forward Planning Meetings." At these meetings, McCann management met with regional management and local heads of agencies and proposed budgets and profit targets for the following year. McCann management then either accepted or rejected the budget. If rejected, the agencies had to return with a higher number to attain. After McCann management accepted the budget for all of its agencies, McCann management then submitted the budget on a consolidated basis to IPG management, who then either accepted or rejected it.

17.    This planning process was updated twice throughout the year -- in the Spring and Summer -- based on actual profits achieved by the agencies and any other developments. During the updating process, new profit targets were set, often above the original target set in the Forward Planning Meeting. These targets were called "stretch targets."

5

18.     IPG too insisted on aggressive profit targets. Failure to meet profit targets would result in lower bonuses for officers and employees, and potentially termination.

19.     IPG's and McCann's focus on profits, and lack of attention to balance sheet issues, as well as IPG's and McCann's inadequate internal controls and books and records, contributed to IPG's and McCann's intercompany problems.

**Intercompany Transactions**

20.     McCann utilized intercompany accounts to record and account for activity conducted between its hundreds of agencies.

21.     When handled properly, intercompany transactions would be booked through a corresponding entry by each side of a given transaction, and would have no impact on McCann's consolidated assets, liabilities, expenses or revenues.

22.     Imbalances occurred, however, for a variety of reasons, including instances where there was a delay in processing of the invoice, or the McCann agency being charged (or its client) disputed the amount of the charge.

23.     In some cases, rather than record an expense, local agencies placed offsetting debits designated as "in dispute" or "in transit" in various suspense accounts on the balance sheets, including an account called "AR-Other" (typically, these accounts were non-intercompany accounts). If the relevant McCann agencies could not then resolve the discrepancy or disputes in intercompany accounts, McCann should have written the amounts off in a reasonable period of time.

24.    IPG's Standard Policies & Procedures ("SP&P") included a provision for intercompany transactions that applied to all operating agencies, including McCann agencies. The policy required that an intercompany invoice be issued for all amounts exceeding $250 and be recorded by the receiving agency in the month received whether or not the invoice was disputed. According to the SP&P, the Controller's office was responsible for resolving disputes that the financial or operational staff of the relevant agencies could not.

25.    IPG also required agencies to complete Schedules A and B to confirm intercompany balances. Schedule A listed an agency's intercompany receivables and Schedule B its payables.

### LaGreca and Watson Failed to Ensure Intercompany Accounts Were Reconciled

26.    From at least 1997 through August 2002, McCann's financial management, including LaGreca, knew that IPG's intercompany policies were not being followed.

27.    During this period, McCann management, including, LaGreca and Watson, knew that intercompany disputes were not being resolved, and intercompany accounts were not being fully reconciled. Moreover, over time, LaGreca and Watson learned that certain intercompany receivables would need to be written off, although they did not know the full extent of the write-offs. Despite this awareness, year after year, LaGreca and Watson failed to address and resolve these intercompany problems, and ignored the red flags that IPG's financial results would be misstated.

7

28.    During the relevant period, LaGreca and Watson also failed to devise a system of adequate internal controls to ensure that intercompany accounts were reconciled on a timely basis and expensed properly.

29.    Similarly, LaGreca and Watson also failed to ensure that McCann kept books and records that accurately and fairly reflected intercompany charges and transactions.

### McCann's Early Awareness of Intercompany Problems

30.    As early as 1997, McCann's financial management knew of intercompany problems, which were the most severe within EMEA, and in particular at MEA. For example, MEA served as a European and global coordinator of "club dues" and other expenses. "Club dues" are one type of intercompany transaction. It represented costs that were incurred by one agency when coordinating services for a global client. The agency that incurred such costs subsequently re-charged a portion to the agencies whose business was enhanced.

31.    In 1997, MEA's Finance Director met with LaGreca and McCann's controller and expressed concerns regarding the lack of a system to handle intercompany disputes. Additionally, MEA's Finance Director pointed out that intercompany policies were not being followed. LaGreca responded that he was aware of these problems and it was on his agenda to be resolved.

32.    By 1998, McCann's financial management was aware of intercompany imbalances and that disputes in intercompany accounts would result in write-offs.

33.    On or about June 3, 1998, EMEA's outgoing Finance Director sent an email to McCann's deputy controller that stated: "[I] see as a critical weakness in they (sic) way that our

8

people handle intercompany transactions. They do not resolve disputes, they are left to stagnate, and the (sic) we have writeoffs."

34. Additionally, on or about July 30, 1998, a senior financial staffer at EMEA sent an email to European finance directors, copied to Watson, among others, stating in part that "I believe that we are all in agreement that the level of intercompany invoices now held in dispute has reached an unacceptable level."

35. The EMEA financial staffer's July 30 email contained a plan to address the intercompany problem, and set a September 18, 1998 deadline for reconciling intercompany accounts. The email then stated, however, that "it is agreed that any write-offs of a material value not be expensed until January 1999."

36. In a follow-up email to McCann's controller and deputy controller dated August 6, 1998, the EMEA financial staffer noted "I hope the information you are receiving on differences on intercompany balances will enable you to resolve the outstanding issues. Hey, what's a $28M discrepancy amongst friends."

37. On or about September 28, 1998, McCann's deputy controller sent a memorandum to all McCann finance directors, copied to LaGreca, stating that "[o]ver the last year intercompany differences have become increasingly material, individually and in the aggregate. In June, as a group, McCann was out an astonishing $40 million. To put this in perspective, IPG as a whole has never had an out of balance that large."

38. The deputy controller's September 28, 1998 memorandum stated that all disputed items were to be resolved by October 31, 1998.

39.    Despite the controller's office directive to resolve intercompany disputes, this never occurred. Additionally, while the controller's office performed quarterly reconciliations of the consolidated intercompany imbalances, and to some extent reconciled the imbalances, their efforts were wholly inadequate. The controller's office failed to obtain information from McCann agencies that showed the actual extent of the intercompany imbalances (e.g., Schedules A and B). The controller's office also failed to review the growing balance in the AR-Other and additional intercompany accounts in which agencies recorded numerous charges.

**McCann Failed to Resolve the Intercompany Problem In 1998**

40.    McCann did not address its intercompany problems in 1998 at least in part so that McCann could hit its annual profit targets.

41.    EMEA's agencies never completed the intercompany exercise described above because various offices asked for additional time to compile the necessary information, and then agencies had to begin preparing for the annual McCann Forward Planning Meeting. McCann's financial management, including EMEA's financial management, never ensured that the agencies circled back to complete the intercompany project.

42.    PwC also raised the intercompany issue with McCann's financial management. During the 1997 and 1998 audit years, PwC UK, MEA's external auditors, listed intercompany as a significant internal accounting control weakness. PwC UK qualified its opinion with respect to intercompany balances in its Audit Summary Memorandum concerning MEA.

43.    Additionally, in or around November 1998, PwC US' global audit partner informed IPG's Audit Committee that "[i]ntercompany accounts should be reconciled and confirmed on a timely basis."

10

**McCann Failed to Resolve the Intercompany Problems in 1999**

44.    Throughout 1999, intercompany problems at McCann continued to persist.

45.    In approximately September 1999, Watson assigned a member of EMEA's financial staff to investigate the reasons intercompany accounts were not being settled and to resolve the underlying problems.

46.    Despite initiating this project, EMEA's financial staff failed to resolve the intercompany problems.

47.    At this time, EMEA was under pressure to hit increased profit targets. In 1999, McCann senior management increased EMEA's profit target by 20% from its profit target in 1998.

48.    As a result, in or around August 1999, Watson sent an e-mail to EMEA's agencies' finance directors instructing them to develop a specific plan to reach their targets because EMEA had: "a serious problem ahead of us with reference to achieving our regional profit target for this year." (Emphasis in original).

49.    Watson and others understood that reconciling intercompany accounts would result in write-offs. Based on a preliminary analysis, EMEA's financial staff concluded that there were numerous disputes about intercompany invoices that had to be resolved and that resolving theses disputes would create losses that would affect EMEA's profit and loss ("P&L").

50.    Watson, therefore, did not schedule the intercompany reconciliation during 1999 so that EMEA would not miss hitting its profit targets. On or about November 12, 1999, Watson sent an e-mail to the EMEA staff that stated: "I have chosen January as the date for the [intercompany] meeting as there are likely to be write-offs which I suspect we would want to

11

make next year rather than this."

51.    In November 1999, McCann's financial staff was scheduled to attend a Forward Planning Meeting.

52.    Prior to this planning meeting, MEA's Finance Director discussed the intercompany imbalances with LaGreca and Watson and told them there were significant amounts of unpaid intercompany receivables that were causing MEA's cash position to deteriorate. LaGreca and Watson insisted that the intercompany problem would be sorted out, and that Watson would soon adjudicate disputed invoices.

53.    Throughout 1999, PwC flagged intercompany as an area of risk. PwC UK qualified its opinion on intercompany accounts at MEA in its 1999 MEA Audit Summary Memorandum. PwC UK noted that MEA continued to have difficulties in reconciling intercompany balances due to the volume of affiliates and the age of a number of disputed items.

54.    PwC US also alerted IPG management and its Audit Committee regarding problems with intercompany reconciliations. In its Internal Accounting Controls and Accounting Procedures for the year ended December 31, 1999, PwC US characterized intercompany as a priority one risk and stated:

> IPG's intercompany out-of-balance has increased dramatically since year-end and analysis and reconciliations are not performed at each period and to ensure that intercompany accounts are properly stated. We noted that intercompany invoices are not consistently recorded properly and in accordance with IPG policy at the agency level. All agencies must record all invoices when received, regardless of disputed items. However, disputed invoices are often not recorded by agencies and invoices often remain outstanding. We noticed several intercompany invoices dating back as far as 1989. In addition, some agencies record the invoices within trade payable and receivable accounts other than intercompany accounts.

12

55.    PwC US characterized the risk arising from intercompany accounts as "failure to reconcile these amounts could result in misstated account. Lack of consistency in recording intercompany invoices can lead to an intercompany out-of-balance situation and ultimately result in misstatements to the consolidated financial statements."

### LaGreca and Watson Continued to Fail to Resolve McCann's Intercompany Problems in 2000- Early 2001

56.    McCann's financial management, including LaGreca, continued to fail to address its intercompany problems in 2000, despite receiving further warnings that intercompany problems remained.

57.    MEA's Finance Director resigned his position in early 2000, and described his "frustration" in his resignation letter to MEA's Managing Director stating:

> I have highlighted major problems with the intercompany system and implementation of our new computer systems, only to be instructed not to discuss these matters further as they are not issues. I understand that the intercompany is being reviewed next year, this was tried last year and absolutely nothing happened.

58.    The resignation letter was forwarded to LaGreca and Watson, among others.

59.    Additionally, in or around January 2000, a McCann treasury staff report prepared for LaGreca and reviewed in draft form by McCann's controller, noted the existence of "[m]any outstanding intercompany invoices (both receivable and payable) are several years old –most notably between London and New York … . It appears likely that many of these accounts will not be settled in full … yet a reserve has not been established against which to eventually write them off."

60.    In late January or early February of 2000, an EMEA financial staff member reported on his project to identify EMEA's intercompany exposures to Watson and McCann's

13

controller. The staff member estimated that the exposures may be as high as $20-30 million.

61.    In late March 2000, Watson and members of EMEA's financial staff corresponded by e-mail with McCann's controller that the next step would be "agree with [McCann's controller on] the accounting treatment of these write offs."

62.    However, questions quickly surfaced concerning the thoroughness and accuracy of the EMEA's financial staff member's report.

63.    In early 2000, McCann hired a new Finance Director for EMEA.

64.    Watson told the EMEA Finance Director, that his priorities should be acquisitions, not financial reporting.

65.    EMEA's new Finance Director learned of the EMEA's financial staff's intercompany project. After reviewing the work that had been done, the new Finance Director immediately concluded the intercompany project was inadequate and that a proper intercompany reconciliation required collecting all Schedules A and B which reflected each offices' individual intercompany receivables and payables, and that the EMEA financial staff had not done this.

66.    The EMEA Finance Director then initiated his own exercise to quantify intercompany exposures.

67.    Subsequently, the EMEA Finance Director warned Watson and McCann's controller that his staff did not receive the required schedules from markets to prepare the reconciliations. On or about June 15, 2000, EMEA's Finance Director sent an e-mail to McCann's controller, with a copy to Watson, that stated:

> for the last month we here in europe hq have been working on reconciling the intercompany. We have made progress but still having difficulty getting local schedules to tie into schedules submitted to ny and do not have schedules of any kind from some offices. Care to guess the last time the intercompany was

14

actually reconciled? Care to guess what we are finding so far? Should I ask why schedules A and B are not reconciled to balance sheets in ny on a quarterly/annual basis.

68.    Watson responded "We have been dancing around this subject for years. Nobody want[ed] to address it."

69.    By the end of August 2000, EMEA's Finance Director still had been unable to complete the intercompany reconciliation project.

70.    In 2000 and 2001, McCann's management and employees resisted reconciliation of intercompany accounts and avoided addressing intercompany exposures due to the pressure to hit profit targets.

71.    In or around March 2000, Watson directed that sending intercompany disputes to local agencies for resolution be deferred while new stretch targets for profits were being sent to those agencies because this would increase the amount of profitability the agency had to deliver because they would have to cover any write-offs associated with intercompany adjustments.

72.    In or around July 2000, concerned that EMEA would fail to reach profit targets, Watson wrote to EMEA's finance directors that:

> Overall, the message is that we <u>have</u> to make the stretch goal. <u>We</u> will be held responsible if we do not. ... Put simply, the stretch goal is not a "goal", it is a <u>mandate</u> and we are the people who make it ... by whatever means we can dream up! (emphasis in original).

73.    Watson discussed with LaGreca the proposed timing of write-offs and his concerns that intercompany write-offs would affect his ability to deliver on the profit target in the EMEA region.

74.    In November 2000, Watson sent an e-mail to EMEA's Finance Director that

15

summarized his conversations with LaGreca, and suggested that intercompany write-offs be taken in 2001 rather than in 2000:

> we want to implement this exercise at a time when people will have time to pick up any itnercompany (sic) costs that are 'in dispute' and the best time to do this is not now but rather at the beginning of 2001 (you will remember that we planned to do this in the 1st quarter in 2000 to leave the rest of the year for people to make up any shortfalls resulting from this exercise).

75.    McCann financial management continued to be aware of the intercompany problem and they expressed concerns about intercompany related write-offs in 2001.

76.    In approximately the Spring of 2000, Watson and EMEA's controller suggested to McCann's controller that any intercompany write-offs should be treated as non-operating for purposes of bonus calculations for the European region.

77.    On February 12, 2001, Watson e-mailed EMEA's controller (and others) and indicated that LaGreca wanted to hold a meeting to analyze intercompany exposures and that:

> to the extent we can afford it, to book them in the same quarter . . . we cannot afford heavy write offs this year with reference to the intercompany problem. This is something we are going to have to 'manage' as, against my and [McCann's controller's] wishes, our target for Europe profit this year has been increased from our original submission.

78.    In early 2001, McCann's Controller discussed with LaGreca an intercompany reconciliation plan that his deputy proposed.   This plan included recording older intercompany exposures as non-operating expenses.

79.    According to McCann's controller, LaGreca rejected the proposal because he wanted to first get a better understanding of the issue at hand, and the exposures themselves, and he did not agree with the treatment the controller's office was proposing.

80.    LaGreca did not specify what additional information he needed and did not

instruct his controller to conduct the exercise differently. This intercompany project, like the earlier projects, was simply never completed.

81.    PwC continued to flag intercompany issues in 2000. For example, PwC US' 2000 Audit Plan provided to IPG's Audit Committee identified intercompany activity as an "area of higher risk" and noted that intercompany activity would be an area of audit focus for the year.

82.    Similarly, as in previous years, PwC UK, in its Audit Summary Memorandum, concluded that it was unable to state an opinion whether MEA intercompany balances were fairly stated.

83.    During the 2000 year end closing for MEA, PWC UK auditors discussed with McCann's controller that the intercompany reconciliation remained in a "poor state."

84.    PWC UK's Audit Summary Memorandum also flagged a significant £11 million intercompany in –transit entry in the "AR-Other" account and noted that intercompany balances in that account should be reclassified.

### IPG's 2001 Restructuring and Other Asset Write-Off

85.    During the second and third quarters of 2001, faced with a sharp downturn in the advertising market and problems arising from a recent significant acquisition, IPG initiated a restructuring exercise that led IPG to record a total charge of $645.6 million in the third quarter of 2001 ("Restructuring"). The Restructuring focused on write-offs primarily associated with severance costs, headcount reductions, and real estate lease terminations.

86.    Additionally, IPG wrote off $85.4 million of various unrealizable assets in the third quarter of 2001 ("Other Asset Write-Off").

87.    During the planning for the Restructuring and Other Asset Write-off in or around

17

May 2001, IPG requested that its subsidiaries, including McCann, provide information on all balance sheet exposures so that the company could address them as part of this exercise.

88.     In anticipation of this exercise, McCann agencies submitted information on intercompany exposures. For example, on or about May 22, 2001, McCann's controller requested that McCann worldwide financial staff complete a template for certain balance sheet accounts, including amounts identified as "A/R Other Intercompany In-Transit" and "A/R Other Intercompany In Dispute."

89.     In response to these requests, on or about June 4, 2001, EMEA's controller submitted to McCann's controller a schedule that showed $42 million in intercompany exposures for periods prior to January 1, 2000.

90.     In approximately May or June 2001, IPG executives, including IPG's CFO and the Head of IPG's Internal Audit, met with McCann's financial management, including LaGreca and McCann's controller.

91.     During these meetings, LaGreca and McCann's controller produced schedules that showed an approximately $20-$30 million intercompany write-off at McCann.

92.     IPG's CFO and Head of Internal Audit reviewed these schedules and referred to McCann's write-off submission as a "wish list" or "Christmas in July." IPG's CFO and Head of Internal Audit felt that McCann wanted to write-off assets without having to do any work and "to get relief and a free ride in terms of recovery of assets that they didn't know whether they were impaired or not."

93.     IPG's CFO then determined that the Restructuring would not include intercompany exposures because these exposures reflected operating expenses that were not

appropriate for restructuring under General Accepted Accounting Principles ("GAAP").

94.     Further, IPG's CFO and Head of Internal Audit told LaGreca and McCann's controller that McCann needed further detailed support to show that intercompany assets were impaired and should be written off as part of the Other Asset Write-Off.

95.     Despite knowledge of this potential exposure, neither LaGreca nor McCann's controller provided the additional information to IPG in 2001, nor did they set any reserves or write-off these amounts.

### A "Fundamental Breakdown of Internal Controls" at McCann

96.     Due to the magnitude of write-offs at McCann in the Restructuring and Other Asset Write-off, during August and September 2001, IPG internal audit and PwC embarked on an extensive review of balance sheet exposures at McCann, with a particular focus on EMEA.

97.     PwC then expressed concerns about the exposures and related internal controls within McCann directly to the IPG Audit Committee. PwC US' worldwide engagement partner circulated a document to the Audit Committee at its October 11, 2001 meeting entitled "Opportunities to Enhance The Company's Internal Control Framework." The document stated:

> [t]he extent of full scope external audits has only been increased incrementally in line with the continued growth of IPG based upon an assessment that the control environment was sufficient to support the level of growth experienced. <u>Recent events, however, have revealed a fundamental breakdown of internal controls at a minimum of two operating groups.</u> [One of which was McCann.] (emphasis added).

98.     PwC US' worldwide engagement partner later described one of the internal control weaknesses as a lack of timely reconciliation of inter and intra company activities.

99.     Following additional discussions, IPG's CFO and Head of Internal Audit assured

PwC that remedial measures, including new financial staff and improved intercompany

reconciliation processes, fully addressed any internal control issues.

100.   In the Fall of 2001, IPG and McCann removed McCann's controller and

transferred him to another function within IPG's headquarters.

101.   During his job transition in or around September 2001, McCann's outgoing

controller met with IPG's CFO and Head of Internal Audit and proposed a $30 million reserve

for intercompany exposures.

102.   Other McCann executives, including LaGreca and McCann's new controller,

generally agreed with this proposal to set reserves, despite the fact a thorough intercompany

reconciliation still had not been performed.

103.   IPG's CFO believed, however, that the reserve request lacked detailed support

and therefore could not be taken.

104.   During late 2001 and early 2002, PwC UK continued to express concerns that

intercompany transactions were improperly recorded.

105.   As in previous years, for the year ended December 31, 2001, PwC UK qualified

its opinion regarding MEA's intercompany accounts in its Audit Summary Memorandum.  PWC

UK's Audit Summary Memorandum also commented on intercompany amounts included in the

"AR-Other" account, in addition to approximately $22 million of club dues that were recorded in

an "AR-Current" account instead of intercompany accounts.

### IPG and McCann Finally Resolve Intercompany Issues

106.   In 2002, IPG's Audit Committee summoned LaGreca to appear at its meeting in

April and directed that all IPG subsidiaries reconcile their intercompany accounts by September

30, 2002.

107. As a result of this directive, on or about May 3, 2002, McCann's new Controller announced that agencies had to reconcile all intercompany amounts by September 30, 2002.

108. The May 3 announcement also provided that agencies who did not eliminate their intercompany out-of-balance by June 10, 2002 would be charged 10% of that amount, which would affect operating incentive amounts.

109. In approximately late July 2002, EMEA claimed to have discovered that many receivables were aged and not collectible, and therefore required write-offs.

110. During early August, IPG and PwC attempted to quantify exposures.

111. On August 13, 2002, IPG announced that it would restate its financial statements for the periods 1997 to March 31, 2002, because it found a total of $68.5 million of charges, primarily in Europe, which had not been properly expensed over these years. Approximately $58 million of its proposed $68.5 million restatement was due to improperly expensed charges for intercompany activity within EMEA.

112. On October 16, 2002, IPG issued a press release announcing that it had uncovered $50 million in additional charges that had to be restated over the same period. Approximately $40 million of these additional charges reflected intercompany transactions within EMEA, including charges for club dues that needed to be written-off.

113. On November 13, 2002, IPG issued a press release announcing that it would restate an additional $60 million of charges in its restatement and that the final amount to be restated would be $181.3 million for the period 1997 through the quarter ended June 30, 2002.

114. In total, $101 million of the $181 related to intercompany transactions, and

approximately 71% of the intercompany charge was attributable to MEA and EMEA.

### Reason for Intercompany Misstatements – The Drive for Profits

115.    Shortly before the restatement announcements, McCann officials drafted various documents that attempted to explain the cause of the intercompany problems. For example, in June 2002, EMEA's Managing Director requested that Watson draft an e-mail to explain how EMEA would not be able to reach its target if certain items were expensed and that EMEA should not be penalized for these write-offs.

116.    Watson drafted this document, which EMEA's Managing Director sent on or about June 5, 2002. In the intercompany section, the e-mail stated:

> In common with other McCann regions, there are a large number of intercompany accounts in EMEA that have not been reconciled for at least 10 years. This is something that has built up over a long period of time. It has nothing to do with our performance this year and quite frankly, is something that should have been cleared up a long time ago. As you know, it wasn't addressed earlier because of its potential firstly, to expose sensitive issues like the Russia problem and secondly, to undermine the profit imperative that required EMEA to use any reserves it may have had to help deliver the 20-30% annual profit growth that we have produced for the last several years.

117.    On or about August 9, 2002, EMEA's controller faxed a memorandum to EMEA's Managing Director describing the reasons for the intercompany exposures at EMEA. The memorandum stated: "Throughout the late 1990's and into 2000, the ME system and Europe in particular did not address intercompany issues, partly due to a lack of cash in the region (there was little clear down of items) but more specifically due to the P&L impact."

118.    Finally, McCann's controller, in his handwritten notes regarding intercompany taken on or about July 29, 2002, wrote: "Drive for Profits!! Caused this."

22

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting McCann's Violations
### of the Antifraud Provisions of the Exchange Act
### (Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)

119.    The Commission repeats and realleges each and every allegation contained in paragraphs 1 through 118, as if fully set forth herein.

120.    As alleged more fully above, McCann, by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

121.    By reason of the conduct described above, McCann violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

122.    By reason of the conduct described above, LaGreca and Watson, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted McCann's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

23

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting IPG's Violations
### of the Reporting Provisions of the Exchange Act
### (Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13
### thereunder)

123.   The Commission realleges and incorporates paragraphs 1 through 122 by reference as if fully set forth herein.

124.   IPG, whose securities are registered pursuant to Section 12 of the Exchange Act, failed to file annual, quarterly and current reports with the Commission that were true and correct, and failed to disclose additional information to make the required statements not misleading.

125.   By reason of the conduct described above, IPG violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13] thereunder.

126.   By reason of the conduct described above, LaGreca and Watson, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78(t)(e)], aided and abetted IPG's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13] thereunder.

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting IPG's Violations of the
### Books and Records and Internal Control Provisions of the Exchange Act
### (Section 13(b)(2)(A) and (B) of the Exchange Act)

127.   The Commission realleges and incorporates paragraphs 1 through 126 by reference as if fully set forth herein.

24

128.    From at least 1997 through 2002, IPG, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

129.    From at least 1997 through 2002, IPG failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances, to record transactions, maintain accountability of its assets, and permit financial statements to be prepared in conformity with GAAP.

130.    By reason of the conduct described above, IPG violated Sections 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (B)].

131.    By reason of the conduct described above, LaGreca and Watson, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78(t)(e)], aided and abetted IPG's violation of Sections 13(b)(2)(A) and (B) [15 U.S.C. § 78m(b)(2)(A) and (B)].

## **PRAYER FOR RELIEF**

WHEREFORE, The Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining LaGreca and Watson, their agents, officers, servants, employees, attorneys, assigns and all those persons in active concert or participation with them, who receive actual notice of the Judgment by personal service or otherwise, and each of them from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1, 13a-11, 13a-13 [17 C.F.R. §§12b-20, 13a-1, 13a-11 and 13a-13].

25

**II.**

Ordering LaGreca and Watson to disgorge all gains, derived directly or indirectly, from their violative conduct alleged herein and to pay prejudgment interest thereon.

**III.**

Ordering LaGreca and Watson to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

**IV.**

Granting such other relief as this Court may deem just and proper.

Dated: _April 30_, 2008

New York, New York

Respectfully submitted,

Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0068 (William Finkel)
(212) 336-1320 (fax)

Of Counsel:
Kay L. Lackey (Not admitted in New York)
Robert Murphy
William Finkel
Amelia Cottrell

26